**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **PATRICK KLINCKMAN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No. 14 C 3445** |
| **v.** | ) | |
| | ) | **Magistrate Judge Daniel G. Martin** |
| **CAROLYN W. COLVIN, Acting** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

This action was brought under 42 U.S.C. § 405(g) to review the final decision of the Commissioner of Social Security denying the claims of Plaintiff Patrick Klinckman ("Plaintiff") for Supplemental Security Income. The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons that follow, the ALJ's decision is reversed and the case is remanded for further proceedings consistent with this opinion.

## BACKGROUND

### I.    PROCEDURAL HISTORY

On July 12, 2011, Plaintiff filed a claim for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, alleging disability since a motor vehicle collision on December 7, 2010.[1] (R. 131-139). The claim was denied initially and upon reconsideration, after

---

[1] The Commissioner contends that "the time period at issue begins in July 2011, the month Plaintiff applied for benefits." Def's Br. at 3. The Commissioner presumably arrived at this understanding of the relevant period by focusing on 20 C.F.R. § 416.335. This regulation concerns the benefit eligibility date. See 20 C.F.R. § 416.335 (stating "[w]hen you file an application in the month that you meet all the other requirements for eligibility, the earliest month for which we can pay you benefits is the month following the month you filed the application."). Here, Plaintiff alleged that his onset date is December 7, 2010. If Plaintiff is correct, the regulation prevents him from receiving benefits until the month following his application date. See 20 C.F.R. § 416.335 (explaining "[i]f you file an application after the month you first meet all the other requirements for eligibility, we cannot pay you for the month in which your application is filed or any months before that month."). However, in determining whether Plaintiff meets the other

which he timely requested a hearing before an administrative law judge on December 18, 2012. (R. 36-59). Plaintiff, represented by attorney Kenneth Dobbs, personally appeared and testified at a hearing before Administrative Law Judge Patricia Supergan (the "ALJ") on December 18, 2012. Vocational Expert Grace Gianforte (the "VE") also testified.

On February 21, 2013, the ALJ denied Plaintiff's claim, finding him not disabled under the Social Security Act.[2] (R. 21-30). The Social Security Administration Appeals Council then denied Plaintiff's request for review (R. 8-11), leaving the ALJ's decision as the final decision of the Commissioner and, therefore, reviewable by the District Court under 42 U.S.C. § 405(g). See *Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005).

## II.    FACTUAL BACKGROUND

### A.    <u>Work and Education</u>

Plaintiff was born on October 10, 1958 and was fifty-four years old and living with his then 84-year-old mother at the time of the ALJ hearing. (R. 42, 52, 162). He has a high school education and a truck driver's certificate. In the ten years prior to his alleged onset date, Plaintiff had worked as a delivery driver, delivering veterinary samples at his most recent job and newspapers at a prior job, and delivering phone books for extra income. (R. 47-48, 199-206). He had also done construction work including carpentry, drywall, framing and concrete. (R. 48).

---

requirements for eligibility, the ALJ was obligated to develop his "complete medical history for at least the 12 months preceding the month" in which he filed his application "unless there [wa]s a reason to believe that development of an earlier period [wa]s necessary" or the Plaintiff indicated that his "disability began less than 12 months before [he] filed [his] application." 20 C.F.R. § 416.912(d). In fact, the ALJ considered evidence in the record beginning on December 7, 2010, the date of Plaintiff's car accident. Because the ALJ did not err by considering evidence in the record prior to Plaintiff's application date, the Court analyzes the facts of this matter starting on Plaintiff's alleged onset date of December 7, 2010.

[2] The standard for determining "disability" for supplemental security income ("SSI") is "virtually identical" to that used for disability insurance benefits ("DIB"). *Hankerson v. Harris*, 636 F.2d 893, 895 n.2 (2d Cir. 1980); *see Craft v. Astrue*, 539 F.3d 668, 674 n.6 (7th Cir. 2008) ("Although the Code of Federal Regulations contains separate sections for DIB and SSI, the processes of evaluation are identical in all respects relevant to this case.") Throughout this opinion, the Court cites to both DIB and SSI cases.

### B.  Medical Evidence

#### 1.  Treating Sources

Plaintiff's long-term chronic conditions include diabetes mellitus resulting in foot neuropathy, and hepatitis C. In addition, on December 7, 2010, he was involved in a motor vehicle collision resulting in multiple injuries, including a fracture in the head of his right femur. Dr. Mukund Komanduri, a board-certified orthopedic surgeon, performed a "nailing" surgery to repair Plaintiff's hip. (R. 378). Since that time, Plaintiff has had two pins in his hip. After the accident, he spent a week at Provena St. Joseph Hospital receiving evaluations and care, followed by a week at an inpatient rehabilitation hospital. (R. 367-411, R. 416-427).

In March 2011, Plaintiff had an outpatient follow-up visit with the rehabilitation hospital, where it was noted that Plaintiff's pain was resolved and he had started driving, but he was "not confident in walking without crutches" and had made a follow-up appointment with the orthopedic surgeon for the following week. (R. 279-280).

Plaintiff visited his orthopedic surgeon, Dr. Komanduri, for follow-up appointments in March, May, July, August, and September of 2011. (R. 431-432, 437-440, 441, 443, 450-456, 467, 460, 471-473, 484, 494-495, 497-506). After each visit, Dr. Komanduri filled out a "Work Status Report" form and wrote a narrative assessment on a "Workmens (sic) Compensation Report."

In March 2011, Dr. Komanduri's report noted that, although an X-ray showed that Plaintiff's fracture was "healing nicely on x-ray," he was still walking on crutches and had "substantial restrictions in terms of flexibility, mobility, and ability to weightbear." (R. 432). After a May 25, 2011 appointment, Dr. Komanduri noted that the fracture was now "well-healed," despite Plaintiff's fears that a recent fall off of the toilet had re-fractured the hip. (R. 451). The doctor prescribed one month of "routine physical therapy" to be followed by a month of "work conditioning" with a functional capacity evaluation. *Id.* However, at his next follow-up appointment on July 6, 2011, Dr. Komanduri noted that, while Plaintiff's flexibility and activities

of daily living had improved, he continued to use a cane to ambulate and was "still too weak to start work conditioning." (R. 455-456). He prescribed an additional month of physical therapy with the plan of moving Plaintiff off of the cane within the month, then starting work conditioning. (R. 455-456).

Meanwhile, Plaintiff was receiving physical therapy treatments at the Athletic and Therapeutic Institute (ATI) from March 29 through July 29, 2011, per the recommendation of his orthopedic surgeon. (444-445, 448-449, 453, 457-458, 461, 474-493). During that period, Plaintiff attended thirty-five treatments and missed fourteen. (R. 457). The numerous progress summary reports filled out during that period are variously signed by physical therapists Ben Wax and Kevin Bresnahan. (R. 207, 444, 445, 448, 449, 453, 457). The narrative portion of each report is nearly identical. The reports describe Plaintiff's functional impairments as decreased range of motion, strength, and joint mobility; and increased soft tissue restrictions with decreased functional mobility secondary to pain. *Id.* Each report concludes that Plaintiff had made "range of motion/strength improvements contributing to increased functional mobility with ambulation." Reports dating from May and July 5, 2011 state that Plaintiff "is unable to safely lift any weight," while the final, July 29 progress report relates that Plaintiff "is currently able to safely lift 10# from bench to standing." (R. 448-449, R. 453, 457). All of the reports further state that his lifting restrictions are "consistent with a PDL of sedentary," as was his job of driver. The July 29 report also indicates that Plaintiff was to continue treatment for one more week, then transition to work conditioning as directed by his doctor.

In August 2011, Plaintiff began a program of work conditioning/hardening with athletic trainer Brian Conroy[3] at ATI's "FIRST" (Functional Integration of Rehabilitation and Strength

---

[3] Mr. Conroy signs his reports, "Brian J. Conroy, ATC, CEAS, KEY Certified Assessment Specialist." Though he is described in the record as a physical therapist, he does not from those credentials appear to hold a graduate degree in physical therapy. Instead, the credentials after his name indicate that he is an Illinois-licensed Certified Athletic Trainer, a Certified Ergonomics Assessment Specialist, and certified to use the KEY Functional Assessments method. 225 ILCS 5/4; http://thebackschool.net/certified-

Training) program. In his progress report covering the week of August 8 to August 14, 2011, Mr. Conroy noted that Plaintiff had been experiencing "secondary pain" in his left knee and ankle, and in his right ankle. That week Plaintiff had attended only one appointment, at which he had "demonstrated the ability to lift and carry 30 lbs. for 100 ft." and reported feeling "pain in his lower extremities" at a level of eight out of ten, which the trainer explained to him as "muscle soreness due to his sedentary life style." (R. 458). Plaintiff made "no complaints of any back pain." *Id.* Per the report, Plaintiff subsequently missed two appointments for various reasons, including a visit to the "emergency room for secondary medical reasons." *Id.*

Hospital records from that week confirm that, on August 11, 2011, Plaintiff reported to the emergency department with lumbar pain that had been present for two days. (R. 266). He exhibited tenderness and swelling in his lumbar region and pain and swelling in his left leg, but otherwise showed a normal range of motion and strength and did not report pain in his right hip. (R. 266-267). He was given pain medication and instructions regarding back exercises and was discharged. (R. 268).

Plaintiff attended two additional work conditioning appointments with Mr. Conroy during the week of August 15, 2011. (R. 461). Plaintiff was able to lift fifteen pounds off of the floor ten times, press fourteen pounds over his shoulders ten times, and carry twenty pounds for 100 feet. He continued to report pain in his left leg and low back, described as eight out of ten on the functional pain scale. Mr. Conroy reported that Plaintiff's improvement was hindered due to "his secondary pain reports," that Plaintiff demonstrated poor body mechanics, and that Plaintiff did not take breaks between repetitions as instructed to decrease his pain. The trainer recommended "further work conditioning/hardening" for five hours a day, five days a week, for two or three weeks "in attempt to further educate proper body mechanics and to develop overall body strength." (R. 461).

---

ergonomics-assessment-specialist/ (last visited January 19, 2016); http://www.keymethod.com/ (last visited January 19, 2016).

In a return visit to Dr. Komanduri on August 17, 2011, Plaintiff complained of pain in his right hip, left leg, and back, with severe pain in his left knee. He was still using a cane and was, per the doctor's report of the visit, "much worse in work conditioning." (R. 469). The doctor observed "lateral joint line tenderness in the left knee," assessed a "positive McMurray's[4] with pain and click consistent with a possible lateral meniscal tear," and prescribed an MRI. *Id.* Later records show that Plaintiff was not approved for an MRI because the left knee was not covered by the Workers' Compensation claim. Dr. Komanduri recommended a short course of therapy followed by a final Functional Capacity Assessment, but told Plaintiff to discontinue "standard work conditioning which is making him worse." *Id.* He opined that he thought Plaintiff would be restricted to sedentary duty and wrote, "I doubt that he will ever function at a higher level." *Id.*

One month later, on September 12, 2011, Mr. Conroy performed a "Key Functional Assessment" of Plaintiff, for which a detailed report and the trainer's written opinion are in the record (R. 475-493). The notes describe Plaintiff's various lifting capacities as ranging from 21.4 to 23.6 pounds and detail both the specific movements performed and Plaintiff's responses during the assessment. Plaintiff's complaints included "I need to sit down," and "it's bothering my hip to lift the weight that high" (upon lifting weight above the shoulder); "I need to sit down, my low back is starting to hurt" and "my low back is hurting" (upon moving weight from desk to chair level and back); and "that hurts my back and I need to sit down" (upon moving weight from chair to floor level and back.) (R. 477). The trainer performed similar assessments, with similar reactions from Plaintiff, of pushing, pulling, and carrying. (R. 478). In a series of balance tests, Plaintiff continued to use the cane with his left hand (R. 478). As to his gait, Mr. Conroy noted, "utilizes cane in left hand, swings with right leg step." (R. 479). He further observed that Plaintiff demonstrated the ability to sit for just thirty-eight minutes before reporting, "I need to get up and move my joints around" and showed a standing tolerance of eight minutes during "assembly

---

[4] A McMurray's test is a rotation test performed by doctors to check for meniscal tears and other internal knee problems. http://orthosurg.ucsf.edu/oti/patient-care/divisions/sports-medicine/physical-examination-info/knee-physical-examination/ (last visited January 22, 2016).

disassembly activities." (R. 479). Plaintiff indicated that he was unable to kneel but reported no pain during crawling and stair climbing. (R. 479).

Mr. Conroy completed a "Client Capabilities & Physical Job Requirements Overview" indicating that Plaintiff could complete a five hour work day with regular breaks, could sit for four hours at intervals of forty-five minutes, could stand for one to two hours with ten minute intervals of rest, and could walk "minimally" for "occasional short distances" a total of one to two hours in a work day. (R. 482). He opined that Plaintiff could frequently lift between seven and fifteen pounds, depending on the posture and arm involved; could frequently push or pull over sixty-nine pounds; could occasionally lift weights between twenty-two and twenty-seven pounds; and could push or pull weight in excess of ninety-three pounds. (R. 482). He could frequently perform most postural and reaching actions, but could never kneel and could only occasionally squat, climb stairs, or balance. (R. 482). Mr. Conroy also wrote a letter to Dr. Komanduri summarizing Plaintiff's course of treatment (five months of physical therapy with objective gains noted, followed by three work conditioning visits "stopped due to subjective complaints of pain") and resulting capabilities. His letter opined that Plaintiff's lifting capabilities met the "light" Physical Demand Level consistent with the demands of his job as a truck driver. He further reported that Plaintiff was "not pleasant and cooperative" and used "profane language" during the assessment, despite being asked to stop. (R. 475-476).

After his final assessment of Plaintiff on September 15, 2011, Dr. Komanduri, who had reviewed Mr. Conroy's report, wrote a final Workers' Compensation Report. Dr. Komanduri opined that Plaintiff had a functional capacity evaluation "at a sedentary level with a 10-pound weight limit. He also cannot climb, squat, or kneel. I believe he is at permanent restrictions. I have nothing else to offer him." Disagreeing with Mr. Conroy's assessment, Dr. Komanduri opined that Plaintiff was incapable of his work as a driver, stating, "there is no way he can climb in and out of a truck." (R. 494).

In addition to the post-operative care he received from Dr. Komanduri, Plaintiff received primary care from Dr. Simon Piller through the Cook County Health and Hospitals System. Though some of the records are difficult to read, pain scale notations show that Plaintiff complained of pain at fluctuating severities, ranging from "no pain" to pain rated seven out of ten, on various days in 2011 and 2012. (R. 589, 591, 593, 594, 596). Dr. Piller also monitored Plaintiff's diabetes care, and in 2012 began testing Plaintiff in preparation for a course of treatments for hepatitis C. (R. 612). On December 13, 2012, Plaintiff had an outpatient liver biopsy, which was reported to be "consistent with chronic hepatitis C, moderately active (grade 3 of 4)." (R. 614, 616).

Dr. Piller's "Medical Evaluation – Physician's Report" form dated January 5, 2012 notes that Plaintiff has "chronic pain" in his lower extremities and an unstable gait. (R. 563). The report also describes Plaintiff's diabetes, foot neuropathy, and positive hepatitis C status. (R. 563-565). In a section of the form devoted to evaluating the Plaintiff's capacity for "substained (sic) physical activity," Dr. Piller indicated that Plaintiff had up to a 20% reduced capacity in sitting and activities of daily living; a 20 to 50% reduced capacity in walking, bending, standing, turning, pushing, pulling, travel by public transportation, and fine manipulation; and more than a 50% reduced capacity in stooping and climbing. He further opined that Plaintiff could during a regular work schedule lift no more than ten pounds at a time. He also opined that Plaintiff's mental impairments resulted in mild limitations in his activities of daily living and a mild impairment in social functioning, and that Plaintiff had experienced one episode of decompensation in the previous twelve months. (R. 566).

Plaintiff visited a podiatry office four times between January and August of 2012 for diabetic foot checks and routine nail care. At each visit, his musculoskeletal exam showed normal ranges of motion and strength in his lower extremities and no tenderness. (R. 555, 572, 575, 579). Notes from January indicate that Plaintiff has numbness on the bottom of both feet, diagnosed as diabetic foot neuropathy. (R. 553, 555). In April, he had no new complaints (R.

571). In July, he had wounds on his feet from walking barefoot on hot cement when he "ran out without his shoes to run after the mailman." (R. 578). His gait was assessed as normal. (R. 579). In August 2012, his gait was again assessed as normal. (R. 575).

### 2.    Consulting Experts

On December 13, 2011, Plaintiff was examined by consultative examiner Dr. Dinesh K. Jain, M.D. In his report, Dr. Jain wrote that, since his car crash, Plaintiff has noted pain in his right hip, both knees, and lower back, with reported pain levels fluctuating greatly between two and nine out of ten. (R. 534). Plaintiff's left knee and leg hurt because "he has favored the left side more since the surgery on the right hip." (R. 534). He exhibited "significant degenerative changes in both knee joints," with the left worse than the right. (R. 535). He had a slightly reduced range of motion in his right hip and used a cane to walk. (R. 536). He was able to get on and off an examining table with moderate difficulty. He was not able to tandem walk (i.e., walk on a straight line), walk on his toes, walk on his heels, squat and rise, or hop on one leg. (R. 536). In addition, Plaintiff's diabetes caused peripheral neuropathy in both feet, with the left foot worse than the right. (R. 534). His hepatitis C was asymptomatic. (R. 534). Dr. Jain ordered x-rays of Plaintiff's hips, his lumbar/sacral spine, and his left knee, which were performed on December 19, 2011. The images of his hips showed the "mild degenerative changes" in the left hip, with the right hip hardware intact and no acute fracture or dislocation. The images of his spine showed degenerative changes at L4-L5 and L5-S1. There was no acute bone abnormality in the left knee. (R. 537-539).

Medical Consultant Dr. Rachel Gotanco, MD reviewed Plaintiff's medical records, including the x-ray reports, and completed a Physical Residual Functional Capacity Assessment on December 20, 2011. (R. 540-547). She opined that Plaintiff could lift twenty pounds occasionally and ten pounds frequently, could stand or walk for at least two hours in an eight-hour work day, and could sit (with normal breaks) for about six hours in an eight-hour workday. (R. 541). She further opined that Plaintiff could walk up to fifty feet without the cane or longer

distances with the cane, that he should be able to carry at least ten pounds in his non-cane hand while walking. (R. 542). Explaining her conclusions, she noted that the physical capacity assessment showed that Plaintiff could lift/carry up to twenty-two pounds while using the cane. (R. 541-542). She also described his somewhat reduced ranges of motion in his right hip and lumbar spine and normal ranges of motion elsewhere, and observed that he continues to use a cane despite his treating physician's attempts to get him to stop. (R. 541-542). As to postural limitations, Dr. Gotanco opined that he could only climb ropes or scaffolds occasionally and could stoop up to frequently, with no other postural limitations. In support of her assessment, Dr. Gotanco wrote that Plaintiff had reported no pain in crawling during his physical capacities exam, though she did note that he "would not attempt to kneel." (R. 542). She opined that Plaintiff does have medically determinable impairments of a prior right hip fracture and diabetes, but that his statements about the degree of his symptoms and limitations were only partially credible. (R. 545). She stated that Plaintiff's hepatitis C was asymptomatic and does not limit him. (R. 547).

Dr. Gotanco acknowledged that the statements of Dr. Komanduri and Mr. Conroy both significantly differed from her own opinions. (R. 546). She indicated that she had "considered" Dr. Komanduri's assessment that Plaintiff could not climb, squat, or kneel, despite her disagreement with those conclusions. As to the opinion of Mr. Conroy that Plaintiff could function at a "light" physical demand level, Dr. Gotanco wrote that "[t]his is an issue reserved to the Commissioner." (R. 546).

### C.     Plaintiff's Function Report and Hearing Testimony

In his Function Report completed in March 2012, Plaintiff reported being unable to drive because of a lack of feeling in the bottoms of his feet, and being unable to sit in a car as a passenger for more than an hour before needing to lie down. (R. 233, 236). He reported poor sleep due to pain, and dizziness from his medications (R. 233, 240). He wrote that he was no longer able to do the activities he enjoyed before his car accident. (R. 237). He also wrote that

he had enjoyed working and needed to "go back to school to find a new career" because "the things I did for work before [I] can no longer do at all." (R. 240).

At his hearing before the ALJ on December 18, 2012, Plaintiff testified that he stopped working in December 2010 due to his car accident. Prior to that, he had worked for a courier service for three months, picking up veterinary samples and delivering them to a lab. (R. 40). He had also worked as a delivery driver and a self-employed construction worker "on and off for fifteen years maybe." (R. 41). As of the hearing date in December 2012, he had not yet filed tax returns for 2009 or 2010 because he was "still gathering the information." (R. 40).

Plaintiff testified that he lived with his mother and that she had driven him to the hearing that day. (R. 43). He indicated that there were very few things he could do around the house, other than get the mail in good weather. (R. 42). He had a prior history of illicit drug use but had quit heroin and cocaine fifteen or twenty years earlier, had quit drinking alcohol in 2006, and had last used marijuana two days before his accident in 2010. He still smoked two or three cigarettes a day. (R. 43, 44, 46).

As to his functional limitations, Plaintiff testified that he could not reach his feet, that his mother helped him with his shoes and socks, and that a podiatrist cut his nails monthly. (R. 49). His diabetes required him to wear slip-on shoes, though he wore lace-up shoes the day of the hearing. (R. 48). Plaintiff further testified that he could only sit for limited periods without discomfort and that he could walk only 50 or 60 feet before sitting down, and even that only with the assistance of a cane. (R. 50, 52). Plaintiff testified to taking two or three naps a day due to the effects of Tramadol and Lyrica, which he took for pain and neuropathy, respectively. (R. 51). He stated that at times he feels dizzy from low blood sugar when he gets up in the night. (R. 53). He testified that a few months before the hearing he had gone to Oak Forest Hospital after a fall that caused him to strike his knee. (R. 53). When questioned if he had trouble "holding a coffee cup or anything," Plaintiff responded in the affirmative, explaining that shaking in his

hands caused him to drop medication frequently. (R. 49). Plaintiff stated that his main weekend activity was watching football on television while lying down in his bed. (R. 50).

### D. **Vocational Expert Testimony**

The ALJ first questioned the VE about Plaintiff's past relevant work, which included the semi-skilled jobs of delivery driver, constructed laborer, and truck driver. She then asked the VE to consider a hypothetical person of Plaintiff's age, education, and work experience, who has the residual functional capacity to perform medium work as defined in the regulations; frequently climb ramps and stairs; never climb ladders, ropes or scaffolds; and frequently balance, stoop, kneel, crouch and crawl. The VE opined that there was nothing in the hypothetical profile to prevent such a person from doing Plaintiff's past work of a delivery driver or truck driver as performed in the national economy. When asked if there would be other jobs available, the VE testified that work as a hand packer, janitor, and van driver would also be available. (R. 56-67).

Next, the ALJ asked the VE to assume a person of Plaintiff's age, education and work experience who had the residual functional capacity to perform light work as defined in the regulations; to occasionally climb ramps and stairs but never ladders, ropes or scaffolds; to occasionally balance and stoop but never kneel, crouch and crawl; to tolerate only occasional exposure to extreme cold, heat, wetness, humidity, hazards such as moving machinery, and unprotected heights; and to perform only unskilled work tasks. (R. 56). The VE opined that the jobs of injection molding machine tender, food sorter, and conveyor belt sorter would be available to such a worker. However, when the ALJ further hypothesized that the individual would require use of an assistive device to ambulate to and from the work station, the VE testified that such a restriction would preclude all light and medium jobs. (R. 57). Upon further questioning, the VE also testified that employers tolerate about 1.3 per month of unscheduled absences in the private sector and 1.6 days per month in the public sector, and that an individual who needed to rest in a recumbent fashion more than twice a day for an hour each would be precluded from competitive employment. (R. 57-58).

### E.    ALJ Decision

At step one of his analysis, the ALJ found that Plaintiff had not engaged in substantial gainful activity since his onset date of December 7, 2010. At step two, the ALJ concluded that Plaintiff had severe impairments of diabetes mellitus and hepatitis C. (R. 23). The ALJ concluded at step three that the impairments, alone or in combination, do not meet or medically equal a listing. (R. 23). The ALJ then determined that Plaintiff retained the Residual Functional Capacity ("RFC") to perform light work as defined in 20 C.F.R. 416.967(b), except he can only occasionally climb ramps and stairs and never climb ladders, ropes, or scaffolds. He can occasionally balance and stoop but never kneel, crouch and crawl. He can tolerate occasional exposure to extreme cold and heat, wetness, humidity, and hazards such as moving machinery or unprotected heights. Further, the ALJ opined that Plaintiff could perform unskilled work tasks that can be learned by demonstration or in thirty days or less. (R. 24).

At step five, based upon the VE's testimony and Plaintiff's age, education, work experience, and RFC, the ALJ concluded that Plaintiff could not perform his past relevant work as a delivery driver, construction laborer, or truck driver, but that he can perform jobs existing in significant numbers in the national economy, including injection molding machine tender, food sorter, and conveyor belt sorter. (R. 28-29). This led the ALJ to find that Plaintiff is not disabled under the Social Security Act. (R. 39-30).

### DISCUSSION

### I.    DISABILITY STANDARD

Under the Social Security Act, a person is disabled if he has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a). In order to determine whether a claimant is disabled, the ALJ considers the following five questions in order: (1) Is the claimant presently unemployed? (2) Does the claimant have a severe

impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform her former occupation? and (5) Is the claimant unable to perform any other work? 20 C.F.R. § 416.920(a)(4).

An affirmative answer at either step three or step five leads to a finding that the claimant is disabled. *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992). A negative answer at any step, other than at step three, precludes a finding of disability. *Id.* The claimant bears the burden of proof at steps one through four. *Id.* Once the claimant shows an inability to perform past work, the burden then shifts to the Commissioner to show the claimant's ability to engage in other work existing in significant numbers in the national economy. *Id.*

## II.    JUDICIAL REVIEW

Section 405(g) provides in relevant part that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Judicial review of the ALJ's decision is limited to determining whether the ALJ's findings are supported by substantial evidence or based upon legal error. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000); *Stevenson v. Chater*, 105 F.3d 1151, 1153 (7th Cir. 1997). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). This Court may not substitute its judgment for that of the Commissioner by reevaluating facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Skinner*, 478 F.3d at 841; *see also Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008) (holding that the ALJ's decision must be affirmed even if "'reasonable minds could differ'" as long as "the decision is adequately supported") (citation omitted).

The ALJ is not required to address "every piece of evidence or testimony in the record, [but] the ALJ's analysis must provide some glimpse into the reasoning behind her decision to deny benefits." *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001). In cases where the ALJ

denies benefits to a claimant, "he must build an accurate and logical bridge from the evidence to his conclusion." *Clifford*, 227 F.3d at 872. The ALJ must at least minimally articulate the "analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005); *Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007) ("An ALJ has a duty to fully develop the record before drawing any conclusions . . . and must adequately articulate his analysis so that we can follow his reasoning . . . ."); *see Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005).

Where conflicting evidence would allow reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner, not the court. *See Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990). However, an ALJ may not "select and discuss only that evidence that favors his ultimate conclusion," but must instead consider all relevant evidence. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994); *see Scrogham v. Colvin*, 765 F.3d 685, 698 (7th Cir. 2014) ("This 'sound-bite' approach to record evaluation is an impermissible methodology for evaluating the evidence."); *Yurt v. Colvin*, 758 F.3d 850, 859 (7th Cir. 2014) (disapproving of "cherry-picking" evidence).

## III.    ANALYSIS

### A.    Medical Opinions

Plaintiff's chief argument for remand is that, pursuant to Social Security Regulations, the ALJ improperly weighed opinion evidence from Doctors Komanduri and Piller and athletic trainer Mr. Conroy. The Court finds that the ALJ failed to give adequate reasons for the weight she gave to the opinions of Plaintiff's treating orthopedic surgeon, Dr. Komanduri. Further, the ALJ erred in giving "great weight" to a single statement made by the athletic trainer. Together, these errors mandate remand for the reasons described below. At the same time, the Court finds that the ALJ gave good reasons for discounting the opinion of treating physician Piller.

A treating physician's opinion is entitled to controlling weight if it is "well-supported" and "not inconsistent with the other substantial evidence" of record. 20 C.F.R. § 416.927; *Loveless*

*v. Colvin*, No. 15-2235, 2016 WL 147547, at *5 (7th Cir. Jan. 13, 2016); *Scott v. Astrue,* 647 F.3d 734, 739 (7th Cir. 2011). An ALJ who affords less than controlling weight to the opinion of a treating physician must furnish "good reasons" for doing so. 20 C.F.R. § 416.927(d)(2); *Scott,* 647 F.3d at 739. And even if a treating physician's opinion is not given controlling weight, an ALJ must still determine what value the assessment does merit, considering "the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability" of the opinion. *Moss v. Astrue,* 555 F.3d 556, 561 (7th Cir.2009) (citing 20 C.F.R. § 404.1527(d)(2)); *Scott,* 647 F.3d at 740; *Campbell,* 627 F.3d at 308.

Opinions from non-physician providers, such as an athletic trainer, may not be used to establish the existence of a medically determinable impairment. SSR 06-03p, *see* 20 C.F.R. 404.1502. Nevertheless, opinions from such sources "may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." SSR 06–03p; *see also Barrett v. Barnhart,* 355 F.3d 1065, 1067 (7th Cir.2004) (stating "[a]lthough Barrett is wrong to argue that a physical therapist's report should be given controlling weight, such reports are entitled to consideration."). Though not every factor for weighing opinion evidence will apply in every case, the ALJ should consider, as applicable, how long the source has known and how frequently the source has seen the individual; how consistent the opinion is with other evidence; how well-supported and explained the source's opinion is; whether the source has a specialty or area of expertise relevant to the individual's impairment.

Here, many of the regulatory considerations favor crediting Dr. Komanduri's assessment: he is a specialist, an orthopedic surgeon who performed Plaintiff's hip surgery in December 2010 and then saw Plaintiff five times over the following ten months. (R. 378, 432, 437-506). Dr. Komanduri's records reflect personal knowledge of Plaintiff's injury, post-surgical rehabilitation, response to treatment, and ongoing symptoms. It is not apparent that the ALJ took these factors into consideration when evaluating Dr. Komanduri's opinion. In considering

just the last of Dr. Komanduri's five narrative reports and then dismissing it as "conclusory with little explanation" and worthy of only "some weight," the ALJ referred to the doctor only as "an orthopedic" who "evaluated the claimant." (R. 27). The ALJ also asserted that Dr. Komanduri's opinion was "not supported by the doctor's own objective clinical findings as to sedentary work." *Id.*

The ALJ has not provided the requisite "good reasons" for affording Dr. Komanduri's opinion less than controlling weight. Instead, ignoring the fact that Dr. Komanduri was Plaintiff's treating physician for his orthopedic impairments throughout his period of recovery from the surgery, the ALJ performed only a cursory analysis of the weight merited by his opinions. The overall record is not inconsistent with a sedentary RFC finding. Sedentary work, as defined by Social Security regulations, requires lifting no more than ten pounds with only "occasional" standing and walking, which the Administration has explained means no more than two hours a day. 20 C.F.R. 416.967(a); SSR 96-9p. Dr. Komanduri found Plaintiff to be limited to lifting no more than 10 pounds and sedentary duty with minimal ambulation. (R. 438, 484). Though Plaintiff demonstrated higher lifting capacities in his work conditioning/hardening sessions and functional capacity assessment, he repeatedly expressed that he was in pain when doing so. (R. 458, 461, 477). Plaintiff reported to the emergency room with back pain within days of his first session and, after three sessions, was ordered to terminate them when Dr. Komanduri assessed that he was doing "much worse" while in the program. (R. 467-469). This evidence suggests that the ten-pound limit is, in the orthopedist's professional judgment, the most that Plaintiff can safely lift in the workplace.

In support of the ALJ's conclusion that Dr. Komanduri's opinion is not entitled to controlling weight, the Commissioner argues that Dr. Komanduri's functional capacities assessment is a "misstatement of Mr. Conroy's evaluation result" and "an obvious and fundamental error in describing Mr. Conroy's findings as showing sedentary, rather than light, work capacity." (Doc. 24 at 5, 6). The problem with this argument is that the ALJ did not say

she was discounting Dr. Komanduri's opinion as a misreading of Mr. Conroy's report. This is the Commissioner's reasoning, not the ALJ's. The Commissioner cannot supplement the ALJ's reasoning or provide a post-hoc rationale for the ALJ's decision. *Steele v. Barnhart*, 290 F.3d 939, 941 (7th Cir. 2002) (7th Cir. 2010) (stating "principles of administrative law require the ALJ to rationally articulate the grounds for her decision," and "confine [judicial] review to the reasons supplied by the ALJ.").

It appears that Dr. Komanduri used his own professional judgment and rejected both the conclusion and the recommendations of the athletic trainer. During the physical capacities assessment, Plaintiff reported that he was in pain, that he needed to sit down, or both, every time he performed a weight-bearing task. He took multiple breaks throughout the session. He demonstrated a thirty-eight minute sitting tolerance before needing to get up to move his joint, and an eight-minute standing tolerance before needing to sit down again. The same day that Mr. Conroy recommended further work conditioning/hardening sessions for five hours a day five days a week, Dr. Komanduri ordered Plaintiff to discontinue the conditioning program, which was "making him worse." (R. 439, 461). On remand, the ALJ is directed to reevaluate the weight to be afforded Dr. Komanduri's opinion as a treating physician. If the ALJ finds good reasons for not giving the opinion controlling weight, she shall explicitly analyze the relevant factors in order to decide how much weight to give the opinion.

After failing to give Dr. Komanduri's opinion controlling weight, the ALJ gave "great weight" to Mr. Conroy's opinion. (R. 27). Mr. Conroy wrote an opinion letter in which he stated that Plaintiff demonstrated capabilities meeting the "LIGHT Physical Demand Level." (R. 475). From this, the ALJ concluded that Plaintiff has the capacities required to do "light work" as defined by Social Security regulations. (R. 27). But the remainder of Mr. Conroy's report does not support that finding. Mr. Conroy's reference to capabilities at the "LIGHT Physical Demand Level" appears to refer only to the weight that Plaintiff could lift, which ranged from 21.4 to 23.6 pounds. (R. 477). In assessing the remainder of Plaintiff's work capacities, Mr. Conroy opined

that Plaintiff could complete only a five hour workday with regular breaks, during which he could sit for no more than four hours at forty-five minute intervals, stand no more than one to two hours with breaks, and walk "minimally" for "occasional short distances" for a total of one to two hours. (R. 482).

Mr. Conroy's opinion, on which the ALJ relied to arrive at the light RFC assessment, does not provide substantial evidence for her conclusion.  Mr. Conroy did not find Plaintiff capable of performing full-time light exertional work. A five-hour workday is simply not consistent with a finding of light work under the Social Security Act. SSR. 96-8p (providing that a person who is incapable of full time work, i.e., eight hours per day, five days a week, or an equivalent schedule, is considered disabled.). There is also nothing in Mr. Conroy's report or anywhere else in the record that suggests Plaintiff can stand or walk for six hours in an eight-hour workday, as the standards for light work require. SSR 83-10. In fact, Mr. Conroy's assessments, if accurate, would preclude *any* work under the Social Security Act, which supposes even at the sedentary level an eight-hour workday in which the individual sits for approximately six hours (with normal breaks). SSR 96-9p. The ALJ's reliance on Mr. Conroy's conclusion that Plaintiff could perform light work is even more troubling given the ALJ's finding that there was "no reason to limit the claimant for the use of a cane." (R. 25). The ALJ failed to acknowledge that Plaintiff used a cane during the balance tests and gait assessment performed by Mr. Conroy. (R. 478-79). This leaves no medical assessment in the record which supports the ALJ's finding that Plaintiff can walk or stand for up to six hours in an eight-hour workday without a cane.

Many of the required regulatory factors caution against heavily weighing the opinion provided by Mr. Conroy, the personal trainer. Social Security Regulations provide a detailed list of "acceptable medical sources" (chiefly, licensed physicians) whose opinions may be used to establish the existence of a "medically determinable impairment," and a second list of "other medical sources" such as nurse practitioners, therapists and caregivers whose opinions an ALJ may consider in determining the severity of an impairment. 20 C.F.R. § 416.913. An ALJ must

consider factors such as the length of any treatment relationship, the consistency of the opinion with the record as a whole, and the opining source's area of specialization in determining how heavily to weigh any opinion. 20 C.F.R. § 416.927. Mr. Conroy has some specialized training but no relevant advanced degree. Before writing his assessment, Mr. Conroy had seen Plaintiff a total of four times over a very brief period—slightly over one month. Instead of considering these factors, the ALJ justified the weight she gave the non-physician source by explaining that his opinion was "based on an extensive examination and includes objective measures of work-related functions,"— even as she ignored many of that examination's relevant findings. (R. 27).

Plaintiff also disagrees with the ALJ's analysis of the opinion provided by Plaintiff's primary care physician, Dr. Simon Piller. The ALJ stated that she gave "no weight to Dr. Piller's opinion as it is based on the claimant's subjective complaints" and "is not supported by his own objective clinical or laboratory findings." (R. 28). As noted above, an ALJ is required to give controlling weight to the opinion of a treating physician only where it is "well-supported" and "consistent with other evidence in the record. *Loveless*, ___ F.3d ___, 2016 WL 147547, at *5. The opinion of Dr. Piller is neither. Further, "where a treating physician's opinion is based on the claimant's subjective complaints, the ALJ may discount it." *Bates v. Colvin*, 736, F.3d 1093, 1100; *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010) (ALJ properly discounted the opinion of a treating physician where "treatment notes [did] not clarify the doctor's reasoning" for opinion other than patient's "own complaints.")

Dr. Piller's "Medical Evaluation – Physician's Report" form dated January 5, 2012 notes that Plaintiff has "chronic pain" in his lower extremities and an unstable gait. (R. 563). The report also describes Plaintiff's diabetes, foot neuropathy, and positive hepatitis C status. (R. 563-565). In a section of the form devoted to evaluating the Plaintiff's capacity for "substained (sic) physical activity," Dr. Piller indicated that Plaintiff had up to a 20% reduced capacity in sitting and activities of daily living; a 20 to 50% reduced capacity in walking, bending, standing, turning, pushing, pulling, travel by public transportation, and fine manipulation; and more than a 50%

reduced capacity in stooping and climbing. He further opined that Plaintiff could during a regular work schedule lift no more than ten pounds at a time. He also opined that Plaintiff's mental impairments resulted in mild limitations in his activities of daily living and a mild impairment in social functioning, and that Plaintiff had experienced one episode of decompensation in the previous twelve months. (R. 566).

As the Commissioner notes, most of these findings extend far beyond the bounds of Dr. Piller's treatment records of Plaintiff. Moreover, to the extent they describe specialized findings related to Plaintiff's orthopedic or mental health, they are beyond the areas of Dr. Piller's specialty as a general practitioner. Plaintiff's periodic visits to Dr. Piller between his alleged onset date and the date of Dr. Piller's opinion reflect routine blood testing, medication management, and diabetes control. Later records also document preparation for Plaintiff's planned course of treatment for his hepatitis C infection, which is asymptomatic. The records of Plaintiff's visits to Dr. Piller do not, however, document any clinical examination of Plaintiff's orthopedic issues. As to Plaintiff's alleged mental impairments, there is in Dr. Piller's records no evidence of any mental health evaluation, assessment or treatment consistent with an ongoing brain injury or mental disorder. Nor is there evidence anywhere in the medical record consistent with even one episode of decompensation caused by Plaintiff's mental impairments. Finally, there is no evidence of any impairment in fine motor function. To the extent he was familiar with Plaintiff's history of pain and functional impairment, Dr. Piller appears to have been informed largely by Plaintiff's own statements.

Plaintiff asserts that, based on the notation "printed by Simon Piller" in the lower left-hand corner of each page of the treatment records from the rehabilitation hospital, it is reasonable to infer that Dr. Piller read those treatment records and used them as a further basis for his opinion. Whether or not this is the case is ultimately irrelevant. The rehabilitation hospital treatment records that Plaintiff cites date from the period of December 15 through 23, 2010. Plaintiff also had one follow-up appointment with the rehabilitation hospital in March 2011. While

these records, which describe the evaluations and therapy that Plaintiff received during the three weeks following his car crash and at one later follow-up visit, are certainly important in understanding the onset of Plaintiff's impairments, they do not, by themselves or in combination with Dr. Piller's other treatment records, offer any illumination as to which of Plaintiff's functional impairments persisted for twelve months or more from the December 7, 2010 onset date. Therefore, the ALJ's reasoning for disregarding Dr. Piller's opinion was sound and based on substantial evidence.

### B. Brain Impairments

Plaintiff next argues that the ALJ's opinion is flawed in its failure to list the "mild mental limitations in social functioning and ability to perform activities of daily living" reported by Dr. Piller as one of Plaintiff's medically determinable impairments, and that this flaw led to the wrongful omission of those impairments from the ALJ's RFC assessment. (Doc. 16 at 10-11). The Court disagrees.

An ALJ must consider any "physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a). Plaintiff points to no plausible medical record of brain impairments that endured or can be expected to endure for the required twelve-month period. Plaintiff attempts to build his case largely on terminology taken from the records of his December 2010 hospital visits, in the two weeks following his car crash. *See, e.g.* Dckt. 16 at 12. Yet upon his discharge from the rehabilitation hospital on December 23, 2010, Plaintiff was deemed "cog[nitively] stable with adeq[uate] coping skills and appropriate frustration" (R. 272) and was at most suffering from "mild TBI" (traumatic brain injury) (R. 281) with "good recall" with his "attention and concentration mildly impaired." (R. 271-272) In a report following his sole follow-up visit with the rehabilitation hospital, in March 2011, Plaintiff was described as "alert, oriented" and "cooperative" with "appropriate mood and affect." (R. 281). The only diagnoses noted in the "Impressions and Plan" portion of that follow-up report relate to Plaintiff's gait and

femoral fracture; there is no reference to his TBI as an ongoing problem, here or in any other medical document from 2011 or 2012. (R. 281). Instead, Plaintiff draws on an array of symptoms—balance problems with mild ataxia, belligerence and lack of cooperation with the athletic trainer, and so forth—to establish his own diagnosis of ongoing effects of traumatic brain injury. (Doc. 28 at 5.) This is not a permissible inference for the ALJ to draw; an ALJ "must not substitute his own judgment for a physician's opinion without relying on other medical evidence or authority in the record." *Clifford v. Apfel,* 227 F.3d at 870 (citing *Rohan v. Chater,* 98 F.3d 966, 968 (7th Cir. 1996)).

In short, the only medical document evidencing any mental disorders persisting beyond December, 2010 is the opinion of Dr. Piller, which stated without any support that Plaintiff had mild limitations in social functioning, mild limitations in his activities of daily living, and one episode of decompensation. The ALJ properly rejected Dr. Piller's opinion for the reasons set forth above.

### C. Credibility Assessment

Plaintiff also challenges the ALJ's finding that his testimony was not fully credible. Because hearing officers are in the best position to evaluate a witness's credibility, their assessment should be reversed only if "patently wrong" and not supported by the record. *Schmidt v. Astrue,* 496 F.3d 833, 843 (7th Cir. 2007); *Castile,* 617 F.3d at 929; *Elder v. Astrue,* 529 F.3d at 413-414 (when considering an ALJ's credibility finding, courts do not review the medical evidence *de novo* but "merely examine whether the ALJ's determination was reasoned and supported.").

In assessing a claimant's credibility, an ALJ must first determine whether the symptoms she reports are supported by medical evidence. SSR 96–7p, at *2; *Arnold v. Barnhart,* 473 F.3d 816, 822 (7th Cir. 2007). If not, SSR 96–7p requires the ALJ to consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists

and other persons about the symptoms and how they affect the individual, and other relevant evidence in the case record." *Arnold*, 473 F.3d at 822-823; 20 C.F.R. § 404.1529; *Carradine v. Barnhart*, 360 F.3d 751, 774-775 (7th Cir. 2004).

The ALJ based her adverse credibility assessment on several factors. She first states that the medical record fails to support Plaintiff's testimony regarding the severity of his symptoms and functional limitations. (R. 25). This finding was based in large part on the ALJ's faulty analysis of the opinion evidence provided by the treating orthopedic surgeon and the athletic trainer. Therefore, on remand, the ALJ should revisit her credibility assessment in light of her new analysis of the opinion evidence. Because the Court reverses on this ground, it need not reach Plaintiff's remaining credibility arguments. *Scott v. Astrue*, 647 F.3d 734, 741 (7th Cir. 2011) (explaining "[t]hese flaws are enough to require us to remand [and] [w]e therefore needn't decide whether the reasons the ALJ gave in support of her adverse credibility finding … were so 'patently wrong' as to separately require remand."). Nevertheless, the Court highlights several concerns regarding the credibility assessment so the Agency can address them on remand.

First, Plaintiff testified that he can walk only fifty or sixty feet without a cane. The ALJ found "no reason to limit the claimant for use of a cane" and that "[o]verall, the evidence does not support use of a cane." (R. 25, 26). This finding is crucial to the ALJ's overall conclusion that Plaintiff is not disabled, because the VE testified that the use of a cane to walk to and from the work station would preclude all light work available to Plaintiff. (R. 57). The ALJ supports her finding in part by pointing out that Plaintiff has no prescription for the cane. As the Seventh Circuit has reiterated, the use of a non-prescribed cane is "not probative" of whether or not a person needs the cane in the first place. *Eaken v. Astrue,* 432 F. App'x 607, 613 (7th Cir. 2011); *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010) (stating "[a]bsurdly, the administrative law judge thought it suspicious that the plaintiff uses a cane, when no physician had prescribed a cane. A cane does not require a prescription.").

The Court finds that the ALJ did not sufficiently explore Plaintiff's use of a cane to ambulate. The medical record shows that the physicians and athletic trainer were aware that Plaintiff uses a cane, but none has said that he does not need it or should not be using it. Dr. Komanduri, Plaintiff's treating orthopedic surgeon, stated on July 6, 2011 that he "plan[ned] on getting [Plaintiff] off the cane in the next month," but Dr. Komanduri did not state in either of his later reports that Plaintiff was off the cane, did not need the cane, or should not be using the cane. (R. 438-440). Plaintiff also used a cane during the balance tests and gait assessment performed by Mr. Conroy, and Mr. Conroy did not indicate that Plaintiff does not need the cane. (R. 478-79). Finally, Dr. Jain noted in his report that Plaintiff "is using a cane to ambulate," but did not opine that the cane was not necessary. (R. 535). On remand, the ALJ is directed to reevaluate Plaintiff's need for a cane.

Second, Plaintiff argues that the ALJ erred in failing to assess Plaintiff's credibility with regard to his testimony that he needed to nap two to three times per day. (R. 51). Plaintiff testified that his pain medication, Tramadol, and his medication for neuropathy, Lyrica, cause him to fall asleep. Id. The VE testified that there would be no work for a person who needs to "rest in a recumbent fashion more than twice a day for an hour a day." (R. 58). When evaluating a Plaintiff's credibility, an ALJ must consider, among other things, the side effects of medication. *Scheck v. Barnhart*, 357 F.3d 697, 703 (7th Cir. 2004). The ALJ mentioned that Plaintiff testified that his "pain medications, Tramadol and Lyrica cause him to have to take a nap two to three times a day," but the ALJ did not explain why she chose not to credit that testimony. (R. 24). On remand, to the extent the ALJ decides not to credit Plaintiff's testimony about his medication side effects, she shall explain her reasoning. *Cuevas v. Barnhart*, 2004 WL 1588277, at *15 (N.D. Ill. July 14, 2004) (holding "[t]o the extent she chose not to address the issues of pain and naps because she found Mr. Cuevas' testimony on these issues to be incredible, the ALJ was required to explain her reasoning.").

Third, the ALJ found Plaintiff's display of physical activity inherent in "running" after the mailman inconsistent with his complaints and "suggests greater ability." (R. 25). The podiatry note on which the ALJ relied reads, "Patient also states that he *walked* barefoot on hot cement when he ran out without his shoes to run after the mail man" (emphasis added). (R. 578). The ALJ's discrediting of Plaintiff based on this statement is overly harsh. The Court notes that the Plaintiff apparently "walked" while performing his alleged "running," and considers it possible that, in speaking to his podiatrist, Plaintiff used "run" as a synonym for "hurry."[5]

D.     **The Grids**

The final issue raised by Plaintiff concerns whether he is entitled to benefits under the Medical-Vocational Guidelines at 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 201.14 (the "Grids") if he is found to be limited to sedentary work. The Court has determined that the ALJ committed reversible error and will need to reevaluate the medical opinion evidence and Plaintiff's credibility upon remand. When the ALJ, on remand, properly re-weighs the available opinion evidence and revisits her credibility assessment in light of that evidence, she may also come to different conclusions regarding Plaintiff's RFC and ability to perform jobs that exist in significant numbers in the regional economy. If Plaintiff's limitations in the ability to complete a work day or his limitations in sitting and standing/walking preclude all but sedentary work, the ALJ shall consider whether the Grids would dictate a finding of disabled.

<u>**CONCLUSION**</u>

For the reasons stated above, the decision of the ALJ is reversed and this case is remanded to the Social Security Administration pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion. The Commissioner's Motion for Summary Judgment (doc. 23) is denied.

---

[5] Merriam-Webster provides this among its alternate definitions of "run" "to go rapidly or hurriedly : hasten <run and fetch the doctor>." http://www.merriam-webster.com/dictionary/run (last visited January 22, 2016.)

ENTER:

DANIEL G. MARTIN
United States Magistrate Judge

Dated:  February 5, 2016